**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-CR-60148-SMITH**

**UNITED STATES OF AMERICA,**

**v.**

**CHRISTOPHER CHAPPELL,**

      **Defendant.**

_____/

## DEFENDANT CHRISTOPHER CHAPPELL'S MOTION FOR VARIANCE AND SENTENCING MEMORANDUM

Defendant Christopher Chappell hereby submits this Motion for Variance and Sentencing Memorandum in support of a sentence below the applicable Sentencing Guidelines range.

### Introduction

The Court is well aware of the *Booker* and Section 3553(a) sentencing factors, so they will not be rehashed here in boiler-plate fashion.   Instead, we provide the Court with the grounds that support a non-custodial sentence with reasonable conditions. The Defense's position will be amplified during the sentencing hearing by expert testimony regarding Chris's history, characteristics, and probability of reoffending.

We also set out the legal basis warranting a variance, as we believe that a sentence below the guidelines is the proper sentence for Chris, and we address the following legal grounds below:

- Chris's history of being a victim of significant sexual abuse as a child;

- Chris's family ties and circumstances;

- Chris's exceptional employment record free of any misconduct;

- Chris's conduct in this case is totally aberrant;

- A sentence below the guideline range will provide more than adequate deterrence;

- A sentence of imprisonment will not provide just punishment for Chris;

- There is no need for Chris's incapacitation;

- The enhancements sought By the U.S. Probation Office do not serve a purpose for Chris's sentencing;

The Court should vary downward based on Chris's personal history and character, as well as other evidence to be presented at the sentencing hearing. Chris's unique personal history and characteristics, the nature and circumstances of his criminal conduct, and the need to provide deterrence and protect the public all weigh in favor of a significant variance in this case.

A sentence well below the guidelines would be more than adequate to punish Chris, deter similar conduct, and serve the purposes of the relevant statutes and Sentencing Guidelines. Without minimizing the seriousness of the offense or making any excuses, Chris asks the Court to vary downward from the applicable guideline range based on the specific circumstances detailed below.

## Background

Chris Chappell is a 46-year-old native Floridian with no criminal history who had an extraordinary career in law enforcement before his arrest in this case. As Chris has acknowledged throughout his life, he has had much to be grateful for, and has had many opportunities. Chris has been a rock for his family and friends when they have experienced difficult times.  However, from the time he was a young child, Chris' life has been filled with

unique challenges and tragedy. As detailed below and in the PSI, Chris was the victim of repeated sexual abuse as a child and faced instability at home.   Both parents suffered from alcoholism, and his mother unfortunately faced a series of ongoing mental health issues. Tragically, Chris lost his 17-year-old younger brother to a drug overdose when Chris was a young man.

Around the same time that Chris lost his brother, Chris completed the Florida Highway Patrol Academy. After beginning as a trooper, Chris rose through the ranks and became a District Commander and a captain of patrol operations in Broward County. Chris also served in the internal affairs department. By any objective standard, throughout his career, Chris was placed in positions of increased levels of trust, especially during his time handling sensitive internal affairs matters. Indeed, "trust" and "integrity" are qualities that appear throughout the letters the Court has received in support of Chris.

Chris is an honest, supportive, and kind person with unique human qualities and experiences, all of which make a variance legally and factually appropriate despite his criminal conduct. He has already begun taking steps to rehabilitate himself. Chris has accepted responsibility for his involvement in this offense. He has remained open to cooperating with the Government, he is remorseful, and is prepared to accept the Court's sentence.

### Discussion

In arriving at a sentence that is minimally sufficient to achieve the goals of sentencing, this Court has broad discretion to craft an appropriate sentence. The Sentencing Guidelines are, "merely advisory, and the Court is not bound to apply the sentence indicated by the Guidelines so long as they are first determined and then carefully considered." *United States v. Gibson*, 442

F. Supp. 2d 1279, 1282 (S.D. Fla. 2006) (citing *United States v. Booker*, 543 U.S. 220, 260–61 (2005)). Moreover, not only are the Guidelines merely advisory, they are not even presumptively reasonable, and they represent only one of a number of relevant considerations. *See Nelson v. United States*, 555 U.S. 350, 352 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable . . . The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable.").

**A.      The guideline range is greater than necessary to achieve the goals of sentencing**

"Sentencing courts are tasked with imposing a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2), which include retribution, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a)." *United States v. Lavariega-Juarez,* 768 Fed. Appx. 978 (11th Cir. 2019). "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007).

Here, applying this tradition yields several compelling reasons for a variance - taken individually or as a whole, but also when considering that almost 60% of defendants sentenced in non-production child pornography cases receive a variance even though the government seeks a below guideline sentence in only 16.8% of those cases.[1] In comparison to many of those cases,

---

[1] *See Federal Sentencing of Child Pornography: Non-production Offenses (2021)* at 5. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf. This statistic extends to the Southern District of Florida and the Eleventh Circuit, which has affirmed numerous sentences where

the argument for a variance is even more compelling here given the facts of the case and Chris'

background. In *United States v. Wachowiak*, 496 F. 3d 744 (7th Cir. 2007), the defendant was

charged with receiving child pornography, including 600 images, some of which portrayed

sadism or masochism. Based on the PSI and the district court's conclusion at sentencing, the

guidelines range was 121 to 151 months. In terms of "the nature and circumstances of the

offense," prong of §3553(a)(1), the court found that several factors mitigated the severity of the

offense, specifically (1) Wachowiak did not entice or have any improper contact with a child; (2)

he cooperated with law enforcement; and (3) he never distributed any images. In terms of the

"history and characteristics of the defendant" prong, the district judge  noted that (1) Wachowiak

had no criminal history or prior drug use; (2) had a successful career before his arrest; (3) his

employers thought highly of him; and (4) two reports, including one by a license psychologist

with expertise in sex predator evaluation determined that Wachowiak posed a low risk for direct

sexual contact with children and was a good candidate for treatment. The court was also moved

by various letters in support of Wachowiak's family and friends. For the detailed and concrete

reasons below, as well as those that will be articulated at sentencing, *Wachowiak* provides a

framework for analyzing Chris' case. Indeed, analysis of both prongs provide a more than

adequate basis for a sentence well below the guideline range.

     1.    <u>Chris was the victim of significant sexual abuse as a child</u>

     As the PSI notes, Chris suffered multiple incidents of sexual abuse as a child, a factor

courts have repeatedly recognized as a permissible basis for a downward variance. *See e.g.,*

---

district courts varied downward in child pornography cases, including cases involving the
distribution or production of child pornography.

*United States v. Armstrong*, 2022 U.S. App. LEXIS 9337 (10th Cir. 2022)(affirming district court's decision to vary based on childhood sexual abuse and its effect on the defendant); *United States v. Patterson*, 615 Fed. Appx. 594, 597 (11th Cir. 2015)(approving variance based in part on the defendant's abuse as a child). Just last month the Eleventh Circuit again approved a district court's consideration of a defendant's sexual abuse and difficult upbringing as a potential basis for a variance that could have been granted were the district judge so inclined. *United States v. Jackson*, 2023 WL 2945162, *3 (11th Cir. April 14, 2023).

The first incident of sexual abuse occurred when Chris was 8, when a "teenager girl with Down's Syndrome took my hand and made me touch her vagina and she tried to touch my penis before I got out of there." The girl pulled Chris into the girls' locker room against his will. After the incident, Chris ran away and didn't tell anyone what had occurred.

The second incident occurred when he was 12 and his next-door neighbors, the parents of a child Chris was babysitting, repeatedly took Chris to the video store, rented pornographic movies, and had Chris sit in the living room with the parents watching the pornography. Chris didn't report this incident and didn't feel that he could leave. After some time, the adults would go to their bedroom and Chris would remain in the living room alone. This occurred on at least three separate occasions. Chris remembers feeling awkward and embarrassed about this and did not report anything to his father.

The third experience occurred when Chris was 12 or 13, when a teenage male neighbor strongly came on to Chris as the aggressor and pressured him to engage in sexual activities such as mutual masturbation and mutual oral sex. As with the other events, Chris recalls feeling like he couldn't leave or say no, and that he felt shame that he didn't feel like he could resist.

These incidents do not excuse what Chris did in this case, and they are not meant to minimize his remorse or acceptance of responsibility. Indeed, Chris is aware "that he's been blessed to have been given the opportunities" he has. *See* Letter from Barbara Darby. But two points are clear: repeated childhood sexual abuse and trauma can have a profoundly negative effect on a person in later years, and courts routinely consider this factor in varying downward under 18 U.S.C. § 3553(a)(1). As the Tenth Circuit acknowledged earlier this month, "the mitigating factor of a defendant being a victim of childhood sexual abuse is not truly addressed in the sentencing guidelines." *United States v. Adams*, 2023 WL 3266822, *2 (10th Cir. May 5, 2023). Rather, this important mitigating factor should be addressed when performing the § 3553(a) analysis. Chris suffered from precisely the type of childhood sexual abuse that warrants a downward variance. As such, these incidents should be considered by the Court in arriving at the lowest possible sentence that will satisfy the goals of sentencing.

2.      Chris' family

The letters the Court has received leave no doubt that Chris has the support of his family, another factor that weighs in favor of a variance. Family circumstances are a material sentencing factor that may be presented to the district court and once presented, this factor must be considered in determining whether a variance sentence is warranted. *See Rita v. United States*, 551 U.S. 338, 364 (2007) (Stevens, J., concurring) (sentencing courts are authorized under § 3553(a) to consider "[m]atters such as … family ties"); *United States v. Arteaga*, 713 Fed. Appx. 933, 936 (11th Cir. 2017) (unpublished) (holding that district court properly considered the defendant's family circumstances when granting a downward variance); *United States v. Prosperi*, 686 F. 3d 32, 48-49 (1st Cir. 2012) (affirming a substantial downward sentencing

variance that was based in part on family circumstances). These letters have a consistent theme: even knowing the nature and seriousness of the crime Chris committed, his family and friends remain behind him because they know him to be a wonderful and caring person fully capable of rehabilitation. For example, Chris' stepbrother Ben Porter writes that:

> It is understood that Chris is pleading guilty to a serious charge. For me and my family it is important to let you know that we love and support Chris and believe in his true nature … the same loving, funny, big-hearted kid that I grew up with and had the luck of becoming my brother. We are here to support Chris 100% during and after this legal process because we love him and know who he really is.
>
> I hope that some of the details I share above will help to better shape for you the sum of who Chris is as a person. A friend and a brother for me and my wife, an uncle to my daughter, and a person that we feel lucky to know and love.

Family support is no less relevant in a child pornography case than in other types of cases. In *United States v. Monetti*, 705 Fed. Appx. 865 (11th Cir. 2017), the defendant had 4,518 images of child pornography on his computers and had received multiple images over the course of a year. Among the file titles were: *my 10 year old daughter willing sex slave pthc(3); PTHC.boys action man-boy ass fuck;* and *Pthc.Lolita.11yo-12yo hard Rape, tortured and suffocate.Snuff(fu)*. The egregious conduct, exponentially more serious and incomparable to the relevant conduct in this case, resulted in a guideline range of 151 to 188 months of imprisonment. In support of a variance based on family circumstances, the defendant's stepfather testified on the defendant's behalf and counsel offered character letters attesting to the significant family support for the defendant. Despite the nature and circumstances of the crime, the court varied downward based in part on the demonstrated support of the defendant's family. The Eleventh Circuit then affirmed that variance.

The nature and circumstances of Chris' case are extremely serious, but the conduct cannot be compared to what happened in *Monetti*. Moreover, Chris' family circumstances seem far more compelling than those in *Monetti*. Both comparisons are suggestive that a variance is warranted

While having family support is a basis for a variance, *providing* family support is also a basis for a variance under § 3553(a)(1). Chris has been a devoted son and family member who has always taken care of those around him. As Chris' aunt Barbara Darby writes, since he was a child, Chris was his grandmother's favorite grandchild because he was always there to help her. He played the same role for other relatives and friends, and this willingness to help others regardless of the circumstances is a constant theme in the letters the court has received.

But most important, Chris is currently the sole supporter of his mother, who relies on Chris for many things. As she explains in her letter to the court, Chris provides financial and physical support for her, and perhaps even more important, emotional support. She writes that:

> As I get older, I find myself relying on Chris much more.  I have been living alone since the passing of my husband in 2012, and maintaining my four bedroom house is becoming increasingly more difficult.  Day-to- day decisions, along with the physical limitations I have, are frequently a source of my weekly phone calls with Chris.  He helps me financially to a certain degree by providing me with a vehicle, appliance replacements and yard care.
>
> We are all the family we've got, and realizing this, we have grown even closer in recent years. I'm now beginning to accept, with reluctance, that I will be needing him more and more.

Put more bluntly, **"he is the only remaining son of his elderly mother. And he is singularly responsible for her continued welfare."** Letter from Marilee K. Roche. Chris' role as the sole supporter of his elderly mother who has suffered so much is an appropriate basis for a variance.

These are exactly the type of circumstances and family responsibilities that justify a downward variance from the advisory guideline range. *See, e.g., United States v. Wadena*, 470 F. 3d 735, 739-40 (8th Cir. 2006) (downward variance warranted even though defendant had prior conviction, due to defendant's diabetes condition and fact that defendant was sole provider for disabled son); *United States v. Roberts*, 2005 WL 1153757, \*7 (S.D.N.Y. May 16, 2005) (unpublished) (downward variance from advisory guideline range was warranted where defendant was the sole support for common-law wife who suffered from a chronic, incurable and debilitating physical illness); *United States v. Husein*, 478 F. 3d 318, 335 (6th Cir. 2007) (in the context of a post-*Booker* departure, affirming downward departure for defendant involved in ecstasy offense when defendant was found to be irreplaceable to her family because she assisted in the care of her incapacitated father and provided 50% of the support for the family). This Court can, and should, consider the central role Chris plays in caring for his mother when determining whether to vary.

Attached and incorporated by reference as Composite Exhibit "1" are numerous letters from individuals in the community regarding Chris. It is a testament to a person's background and character that, despite the facts and circumstances surrounding the charges against him, and his admission to such conduct, that many individuals who know Chris would come forward and express their support in order for the Court to have a clearer picture of what this man is really like.

His family, friends, and colleagues have each taken the time and care to inform the Court about Chris and ask Your Honor for leniency and compassion at his sentencing.  All of these letters describe the Chris they know and love.  Each individual who has written a letter on his

behalf has been touched by him in one form or another and has shared that experience with the Court.

   3.   <u>Chris had a stellar employment record free of any misconduct</u>

As the PSI notes, Chris had a truly exceptional career with the Florida Highway Patrol. The clearest sign of the trust FHP placed in Chris was his selection to serve in Internal Affairs. This is the true of any law enforcement agency, and it speaks volumes Chris' dedication to public safety.

While Chris earned the trust of his supervisors, he was always focused on the people he served. Sadly, this is not true of every member of law enforcement, but it was certainly the case with Chris. One example relayed by Chris' aunt conveys this quite well:

> Chris cared about the citizens he served. Part of his job as a trooper was to notify families when their loved one had died or was injured after a motor vehicle accident. He was often chosen or asked by other troopers to be the notifier because they knew he was compassionate and particularly helpful to families. That aspect of the job seemed to me to be the most difficult for him. I remember a Christmas Eve when Chris had responded to a fatality and later notified the family that their son had been killed. He was visibly affected. It was part of the job and he did it well, but it was tough for him.

While his promotions show that Chris was extremely successful in the technical, operational, and enforcement components of his job, the fact that he was chosen by other troopers to be the notifier says even more about the type of person Chris has always been: compassionate, reliable, strong, and dedicated. This is the true Chris Chappell, and while these positive qualities and evidence don't change, excuse, or even explain the crime Chris takes responsibility for, the Supreme Court requires the Court to consider Chris "as an individual" and consider that "every case as a unique study in the human failings that sometimes mitigate,

sometimes magnify, the crime and punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007).

4.      Chris' Legal History is Without Blemish

Chris' conduct in this case is completely aberrant. He has *never* had any criminal, civil, regulatory, or administrative contact with any federal, state, or local agency. In fact, there was no child pornography found on *any* of Chris' electronic devices despite the search of his residence. In terms of analyzing the law-abiding personal history of a defendant, there is generally a great deal of variation among a group of defendants even where all the defendants have no criminal history points. On one hand are defendants with a history of arrests, very old convictions, and non-adjudicated or dismissed cases, none of which result in criminal history points. In the middle are defendants who have no criminal background, but who have prior civil or regulatory adjudications or administrative violations. At the other end are defendants who, like Chris, have a spotless record. As all these defendants would be treated the same under the Sentencing Guidelines, §3553(a)(1) suggests those differences should be accounted for in a variance based on a defendant's unique history and personal characteristics. This is certainly the case here. Chris has been a productive and law-abiding citizen his entire life. He has had no other brushes, or even near brushes, with the law. His personal and professional life have been characterized by integrity, honesty, and, more broadly, doing the right thing.

While Chris' lack of criminal history will be partially taken into account in calculating his advisory Guideline range, that is no bar to also using it as a basis for a variance. *See United States v. Chase*, 560 F. 3d 828, 831 (8th Cir. 2009). The Eleventh Circuit affirmed the use of this

factor, in combination with others, to affirm a downward variance in *United States v. Pugh*, 515 F. 3d 1179 (11th Cir. 2008), as have numerous other courts around the country.[2]

The advisory guideline imprisonment for accessing child pornography would be greater than necessary to comply with the sentencing objectives of 18 U.S.C. § 3553(a). As Judge Myron H. Bright from the 8th Circuit Court of Appeals recognized, "[s]ince their adoption in 1987, many of the federal sentencing guidelines have proven unworkable, unfair, and have filled our federal prisons with defendants serving undeserved  sentences, all at a higher cost to the government." *United States v. Spencer*, 700 F. 3d 317, 326 (8th Cir. 2012) (Bright, M., dissenting).

Chris' Offense Conduct described in PSR represents a clear aberration for him, hence the complete absence of additional criminal conduct in his Criminal History.[2] His conduct in the present offense was clearly a type of "aberrant behavior" and warrants a consideration for variance much like the departure of U.S.S.G. § 5K2.20.

5.   A sentence below the guideline range will provide more than adequate deterrence

In considering whether a downward variance is appropriate, the Court must consider the need to afford adequate deterrence and protect the public from further crimes of the defendant. 18 U.S.C. §3553(a)(2). It is appropriate and logical to consider how the people closest to Chris will treat him in the future knowing the full scope of his criminal acts. After all, if there is a fear

---

[2] *See, e.g.*, *United States v. Howe*, 543 F. 3d 128, 132-33 (3d Cir. 2008); *United States v. Hadash*, 408 F. 3d 1080, 1084 (8th Cir. 2005); *United States v. Marsh*, 820 F. Supp. 2d 320,  360 (S.D.N.Y. 2011); *United States v. Davis*, No. 07 Cr. 727 (HB), 2008 U.S. Dist. LEXIS 44030; *United States v. Toback*, No. 01 Cr. 410, 2005 U.S. 2008 WL 2329290 (S.D.N.Y. June 5, 2008).

a defendant convicted of a child pornography offense will be a danger or will reoffend, one would expect that person's friends and family to treat him differently after learning the details of the offense. The opposite is true with Chris. Matt Voorhees, Chris' boyfriend until earlier this year, said this of Chris:

> Most importantly to me, he has been a wonderful influence on my son as we have lived together as a unit these past six years. **There is not a moment of hesitation I have in allowing Chris and my son to spend time together, past or future**. But, this too, is something that we have all lost as part of the government's condition of his bail; our family unit has not been allowed to see, nor communicate together during this very hard nearly year-long period. This impact has been especially hard, dare I say cruel, on a child that does not understand the unique legal nuances surrounding this case.
>
> **Finally and emphatically, Chris would never physically hurt anyone -- let alone a child.**

Matt knows Chris as well as anyone in the world, and he is fully aware of all the details of Chris' criminal conduct. His words are perhaps the strongest and most reliable evidence that granting this motion for a variance will have no negative effect on deterrence for someone like Chris. Another friend and lawyer, Michael Riney, wrote a letter to the Court stressing the same important point: he doesn't think there is any risk that Chris is a danger to reoffend or harm anyone. Mr. Rainey writes:

> Finally, and perhaps most importantly here, I am the father of four teenagers.
>
> **Knowing everything I know - and I believe I am familiar with every fact relevant to this case - I still trust Chris implicitly. Even to the point that I would trust him with the oversight of my four children. Because Chris' defining characteristic is that he is trustworthy.**
>
> I truly wish that, before imposing sentence, the Court could somehow get to know Chris Chappell as well as I know him. Chris Chappell will do the work. He will continue the treatment he has already begun. He will

abide by whatever conditions or restrictions the Court decides to impose on him. **Chris does not need to spend time in prison to learn his lesson.**

As Mr. Rainey writes, as an attorney and friend to Chris, he is familiar with all the relevant conduct in this case. He has reviewed the charges, knows exactly what Chris did, and knows Chris extremely well. He does not minimize the crime or make excuses for Chris. Despite this, he would trust Chris with his children because Chris' conduct was aberrational, and he is trustworthy. Clearly a significant variance is appropriate for someone like Chris.

Finally, in assessing deterrence, courts can and should consider a defendant's post arrest/pre-sentencing conduct to determine the likelihood that a defendant can be rehabilitated and become (or remain) a productive member of society. Here, Chris has voluntarily sought out counseling and treatment for sexual addiction, and he has begun to address some of the issues that led him to make the terrible choice that led to his arrest in this case. Everyone who knows Chris is aware he has begun the rehabilitative process and that a sentence well below the guideline range will not jeopardize deterrence at all. This view is best summed up by David and Elisabeth Cohen, who write that:

> We were both shocked and saddened when we learned about the poor choices Chris made leading to his arrest and, ultimately, his guilty plea. Nevertheless, we believe that Chris understands the seriousness of his actions and is ready to accept responsibility for them. In the past year, Chris has made a strong commitment to personal growth and self-improvement by attending an intensive in-patient rehabilitation program to address the underlying issues that led to his involvement in this situation. We believe that he can once again be a positive member of his community.

Like so many of Chris' close friends and family, they know that Chris will never repeat the horrible mistake that has led to this point.

6.    <u>A sentence of imprisonment will not provide just punishment for Chris</u>

*A.    Just Punishment*

Chris will probably be required to register as a sex offender with the State of Florida, with the publication of that information to the community and his friends and neighbors.  He would have to carry that proverbial "Scarlett Letter," in shame.  His pension is also in serious jeopardy.

As several courts have recognized, collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment.  *See, e.g.*, *United States v. Garate*, 543 F. 3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F. 3d 468, 474-75 (4th Cir. 2007) (affirming in a case involving a conviction for possession of child pornography after *Gall*, the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," *id.* § 3553(a)(2)(A), and "adequate deterrence," *id.* § 3553(a)(2)(B)); *United States v. Gardellini*, 545 F. 3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings, "were directly relevant to the § 3553(a) analysis, which requires sentences to reflect, among other things, "the history and characteristics of the

defendant," the need to, "protect the public from further crimes of the defendant," the need to, "provide just punishment for the offense," and the need to, "afford adequate deterrence").

### B.      Seriousness of the offense

By way of background, and in order to assist this Court in refuting Congress's reasons for increasing penalties for child pornography offenses over time, the history of the child pornography guideline as it affects Chris's guideline range is set forth in Appendix 1.  As set forth in Appendix 1, Congress directed the Commission to take three actions relevant to Chris's guideline calculation:  (1) increase the base offense level from 10 to 13 in 1991; (2) increase the base offense level from 13 to 15 in 1995; and (3) add the 2-level enhancement for use of a computer.

Congress did not make formal findings in support of any of these actions, but its reasons can be gleaned from the legislative history.  This history suggests that Congress acted on three primary beliefs:  (1) child pornography possessors are pedophiles who use pornography to sexually abuse children; (2) increasing penalties for possessors will dry up the market and thereby prevent the sexual abuse of children by removing the market incentive for those who abuse children for the purpose of producing new images; and (3) severe penalties will deter others from possessing child pornography.  Each belief is based on assumptions that current empirical evidence refutes.

Congress's actions with respect to the child pornography guideline have stemmed in large part from the belief that those who view child pornography are actually child molesters.[3]  Under

---

[3] *See* 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (in support of directing increase to base offense level from 10 to 13); *id*. at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) (same); 141Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley) (in

this view, punishing child pornography possessors or those who access such material serves as a proxy for punishing child sexual abusers.

Aside from the lack of evidence to support this belief in general, *See U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offense*s (2012) ["*Child Porn Report*"] at 104 (confirming that, "not all child pornography offenders are pedophiles or engage in other sex offending"),[3] Chris has not been convicted of sexually abusing a child, <u>has never</u> sexually abused a child, and is at no risk of harming a child.

This clearly distinguishes Chris from the offenders Congress had in mind, and is therefore highly relevant. *See United States v. Marshall*, 870 F. Supp. 2d 489, 491-92 (N.D. Ohio 2012). (rejecting presumption that "those who view child pornography are indistinguishable from those who actually abuse children," finding instead that the "[e]mpirical data strongly suggests that viewing child pornography does not equate to child molestation"); *United States v. Kelly*, 868 F. Supp. 2d 1202, 1207-08 (D.N.M. 2012) (rejecting government's argument that guideline range is appropriate because of the, "chance that [defendant] will molest children in the future, or that he has in the past," as this, "speculation is directly contrary to submissions by Kelly's therapist and Kelly's psychiatrist," the defendant, "has never been accused of hands-on abuse," "empirical testing disproves the fear that the typical child pornography defendant will go on to molest children," and "[a]ny Guideline based on

---

support of directing additional increase in base offense level from 13 to 15); 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch) (in support of directing expanded reach of "distribution" enhancement); 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch) (in support of Feeney Amendment, which included number-of-images enhancement); *see also generally* Child Pornography Prevention Act of 2006, Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26 (1996); S. Rep. No. 108-2, at 3 (2003); S. Rep. No. 104-358, at 12-14 (1996); USSG app. C, amend. 592 (Nov. 1, 2000).

unsupported fears, rather than actual evidence, is far more likely to render an unreasonable sentence"); *United States v. Cruikshank*, 667 F. Supp. 2d 697, 703 (S.D. W.Va. 2009) ("Rarely able to catch the monsters that create the images, society reflexively nominates the consumers of this toxic material as proxies for the depraved producers and publishers."); *United States v. Phinney*, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009) ("[C]ourts should not assume that a defendant has or will commit additional crimes without a reliable basis."); *United States v. Grober,* 595 F. Supp. 2d 382, 404 (D.N.J. 2008) ("[T]he Court cannot make [Defendant] a surrogate for the monsters who prey on child victims through actual contact."), *aff'd* 624 F.3d 592 (3d Cir. 2010).

Another justification for severely punishing child pornography offenders is that they support the market for child pornography and thus encourage the abuse of more children in order to create new images. *See* 136 Cong. Rec. S4730 (Apr. 20, 1990) (Senator Thurmond). Aside from the evidence that disproves this belief in general, Chris did not pay for or trade any images. His conduct is not contributing to the global demand for child pornography, and not causing any new child pornography to be made because the picture he viewed already exists and no financial or other incentive is given.

Under these circumstances, where no economic or other incentive was given to anyone to create or post more or newer images, there was "no market effect" from Chris's actions. Troy Stabenow, *A Method for Careful Study: A Proposal for Reforming the Child Pornography Guidelines*, 24 Fed. Sent'g Rep. 108, 124-25 (2011) [Stabenow, *A Method for Careful Study*].

In determining an appropriate sentence, this Court must consider the sentences available by statute. *See* 18 U.S.C. § 3553(a)(3). Congress set the statutory range of imprisonment for Chris's offense at zero to twenty years, and authorized a term of probation. *See* 18 U.S.C.

§2252(b)(2); 18 USC § 3561.  The bottom of Chris' guideline range of imprisonment that is suggested by the U.S. Probation Office is 30 months.

As many courts have observed, the child pornography guideline, by enhancing sentences based upon factors that are inherent in the crime and thus appear in nearly every case, and fails to meaningfully distinguish more serious offenders from less serious offenders.[4]

Chris's conduct and characteristics could not be farther from these.  He has never improperly touched a child, he did not share files, he has admitted what he had done, he has fully accepted responsibility for his offense, and has participated in extensive treatment.  Experts have concluded that he presents no risk of ever harming a child.

One of the goals of the Sentencing Reform Act of 1984 ("SRA") was to provide for proportionality in punishment among offenses of different seriousness.  S. Rep. No. 98-225, at 45-46 (1983).  The child pornography guideline fails that goal, as several courts have noted. *See, e.g.*, *United States v. Dorvee*, 616 F. 3d 174, 187 (2010); *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1106 (N.D. Iowa 2009); *Cruikshank*, 667 F. Supp. 2d at 702.

7.    There is no need for Chris's incapacitation pursuant to 18 U.S.C. § 3553(a)(2)(C)

A primary assumption underlying Congress's actions with respect to the child pornography guideline has been that possessors of child pornography, and those who access it, are likely to sexually abuse children.   This belief is contrary to the empirical research in general, and is unjustified based on the evidence in Chris's case.

---

[4] *See, e.g.*, *United States v. Durham*, 618 F.3d 921, 931 n.7 (8th Cir. 2010); *United States v. Dorvee*, 616 F.3d 174, 187 (2d Cir. 2010); *United States v. Kelly*, 868 F. Supp. 2d at 1208-09; *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1105 (N.D. Iowa 2009); Cruikshank, 667 F. Supp. 2d at 702.

Current empirical research demonstrates that, "first-time child pornography possession only offenders appear to be very low risk of sexual recidivism [of any kind], in contrast to those with any prior or concurrent criminal convictions or those who engage in other sexual offending (e.g., attempted or actual contacts with a child, production of child pornography)," Written Statement of Michael C. Seto, Ph.D., C. Psych. before the U.S. Sent'g. Comm'n at 4 (Feb. 15, 2012),[5] and, "online offenders who had no history of contact offenses almost never committed contact sexual offenses."  Michael C. Seto *et al.*, *Contact Sexual Offending by Men With Online Sexual Offenses*, 23 Sexual Abuse 124, 137 (2011); *see also* Written Statement of Richard Wollert, Ph.D. before the U.S. Sent'g. Comm'n, at 14-17, 21-22 (Feb. 15, 2012) (reporting that in his study of 72 federal child pornography offenders under supervision, including three production offenders, with varying criminal histories, two were arrested for possessing child pornography and none were arrested for a contact offense within four years);[6] Helen Wakeling *et al.*, *Comparing the Validity of the RM 2000 Scales and OGRS3 for Predicting Recidivism by Internet Sexual Offenders*, 23 Sexual Abuse: J. Res. & Treatment 146, 164 (2011) (child pornography offenders, "do not, as a group, present a significant risk of escalation to contact sexual offenses."); Jérôme Endrass *et al.*, *The Consumption of Internet Child Pornography and Violent Sex Offending,* 9 BMC Psychiatry 43 (2009) (study that followed 231 child pornography offenders for six years after initial offenses found that only two offenders (0.8%) committed a

---

[5] Available at
http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/
20120215-16/Testimony_15_Seto.pdf.

[6] Available at
http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/
20120215-16/Testimony_15_Wollert_2.pdf.

contact offense, and only nine offenders (3.9%) committed a non-contact sexual offense, and concluded that, "the consumption of child pornography alone does not seem to represent a risk factor for committing hands-on sex offenses … at least not in those subjects without prior convictions for hands-on sex offenses"); Michael C. Seto & Angela W. Eke, *The Criminal Histories and Later Offending of Child Pornography Offenders,* 17 Sexual Abuse 201, 207-08 & tbl.III (2005) (finding that 1.3% of those who had committed child pornography offending only recidivated with contact sex offenses, "our finding does contradict the assumption that all child pornography offenders are at very high risk to commit contact sexual offenses involving children."); L. Webb *et al.*, *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*,19 Sexual Abuse 449, 463 (2007) (finding Internet-only offenders, "significantly less likely to fail in the community than child molesters," and concluding that, "by far the largest subgroup of internet offenders would appear to pose a very low risk of sexual recidivism.").

As one district court recently put it, "the empirical literature, which generally concludes that there is little — if any — evidence of a direct correlation between viewing child pornography and the viewer's commission of 'contact' sexual offenses." *Marshall*, 870 F. Supp. 2d at 492. There is no evidence that Chris has an antisocial personality. He does not pose any physical danger to children, and is highly unlikely to repeat the offense, or engage in similar activities.

Indeed, Chris' history and characteristics make him a very low risk to re-offend. According to the Commission, recidivism rates in general, defined to include technical supervised release violations, "decline relatively consistently as age increases," from 35.5% for

offenders under age 21, **down to 12.7% for offenders age 41 to 50**, and down to 9.5% for offenders over age 50.  U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12 (2004) ["U.S. Sent'g Comm'n, *Measuring Recidivism*"].

The Commission's research also demonstrates that employment, education, and family ties and responsibilities all predict reduced recidivism, *see* U.S. Sent'g Comm'n, *Measuring Recidivism* at 12-13; U.S. Sent'g Comm'n, *Recidivism and the "First Offender"* 8 (2004), as does substantial other research.  For sex offenders, cognitive behavioral therapy substantially reduces recidivism.  U.S. Dep't of Justice, Center for Sex Offender Management, *Understanding Treatment for Adults and Juveniles Who Have Committed Sex Offenses* 10 (2006).

As the Commission reports, recent studies show that "appropriate 'treatment interventions  …   are associated with lower rates of recidivism—some of them very significant,'" *Child Porn Report* at 278 & n.31 (citing a project funded by the Department of Justice), and that, "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.  Chris' treatment intervention included polygraph testing, which he passed.

In short, Chris' age, strong family support, professional background with the Florida Highway Patrol, gainful employment until his retirement, and successful completion of behavioral therapy strongly support the conclusion that he is not likely to reoffend.  Supervised ~~release with appropriate cond~~itions is more than sufficient to ensure that he never does.

8.     <u>The Enhancements Sought By the U.S. Probation Office in This Case Do Not
Serve Their Purpose for Sentencing</u>

The enhancements for material involving prepubescent minors and the use of a computer apply in nearly every case sentenced under § 2G2.2.  Those are the two enhancements sought by the U.S. Probation Office in Chris's case.  In fiscal year 2011, 95.3% of defendants received the 2-level enhancement for material involving prepubescent minors; and 97.4% received the 2-level enhancement for use of a computer.  U.S. Sent'g Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2011).

These circumstances thus describe conduct that is, "essentially inherent to the crime itself," not an aggravating factor describing a more serious offense or higher risk of harm.  *Kelly*, 868 F. Supp. 2d at 1208-09.  As the Sixth Circuit has recognized, enhancements that apply in "almost every case" are contrary to the purpose of enhancements, which, "are meant to increase a sentence for conduct more aggravated than the typical type of offense." *Robinson*, 669 F.3d at 778 (discussing the enhancement for "use of a computer").  Such enhancements render § 2G2.2 an "anomaly."  *Id.*

The Sentencing Commission confirms that, "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, so that the, "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323.  As the enhancement for computer use and type of images "now apply to most offenders," the guideline, "fail[s] to differentiate among offenders in terms of their culpability."  *Child Porn Report* at ii, xi, 209, 323.

### Conclusion

For all the reasons set forth above, Chris and undersigned counsel respectfully submit that there is more than sufficient evidence for the Court to grant a significant variance. Doing so would reflect the seriousness of the offense, adequately punish Chris, and serve all the goals and objectives of federal sentencing.

Dated: May 31, 2023.

Respectfully submitted,

/s/Leah H. Mayersohn
Leah H. Mayersohn, Esq.
FBN: 0009059
Mayersohn Law Group, P.A.
101 N.E. Third Ave, Suite 1250
Ft. Lauderdale, Florida 33301
(954) 765-1900
service@mayersohn.law
Attorney for Mr. Chappell

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of May, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

Respectfully submitted,

/s/Leah H. Mayersohn
Leah H. Mayersohn, Esq.
FBN: 0009059
Mayersohn Law Group, P.A.
101 N.E. Third Ave, Suite 1250
Ft. Lauderdale, Florida 33301
(954) 765-1900
service@mayersohn.law
Attorney for Mr. Chappell